```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY


                                    )
In re:                              )
                                    )
NICKELS MIDWAY PIER, LLC            )    HONORABLE JOSEPH E. IRENAS
                                    )         CIVIL ACTION
              Debtor.               )       NO. 07-1990 (JEI)
                                    )
                                    )    BANKRUPTCY NO. 03-49462(GMB)
NICKELS MIDWAY PIER, LLC            )
                                    )             OPINION
Appellant / Cross-appellee,         )
                                    )
     v.                             )
                                    )
WILD WAVES, LLC                     )
                                    )
Appellee / Cross-appellant.         )
                                    )
```

**Appearances:**

TEICH GROH
By: Brian W. Hofmeister, Esq.
691 State Highway 33
Trenton, New Jersey 08619
     Counsel for Nickels Midway Pier, LLC

SHERMAN, SILVERSTEIN, KOHL, ROSE & PODOLSKY
By: Fredric R. Cohen, Esq.
Fairway Corporate Center
4300 Haddonfield Road
Pennsauken, New Jersey 08109
     Counsel for Nickels Midway Pier, LLC

COZEN O'CONNOR
By: Arthur J. Abramowitz, Esq.
Jerrold N. Poslusny, Jr., Esq.
Liberty View, Suite 300
457 Haddonfield Road
Cherry Hill, New Jersey 08002
     Counsel for Wild Waves, LLC

1

```
FORD, FLOWER & HASBROUCK
By: Willis F. Flower, Esq.
Central Square
New Road & Central Avenue, Suite 42A
P.O. Box 405
Linwood, New Jersey 08221
     Counsel for Wild Waves, LLC
```

**IRENAS**, Senior District Judge:

This matter comes before the Court on the appeal of Debtor Nickels Midway Pier, LLC ("Nickels") and cross-appeal of Wild Waves, LLC ("Wild Waves"), from the Bankruptcy Court's order of March 6, 2007. For the reasons that follow, the Court will affirm the Bankruptcy Court's order.

**I.**

The background facts of this case have been recited in previous opinions of this Court,[1] and various opinions of the Bankruptcy Court. The following facts are relevant to the present appeals.

Nickels is the owner and lessor of an amusement complex pier (the "Pier") in Wildwood, New Jersey. In May, 1999, Wild Waves entered into a written lease with Nickels, whereby the parties agreed that Wild Waves would rent 70% of the Pier for the purposes of constructing and operating a water park, and

---

[1] *See Nickels Midway Pier, LLC v. Wild Waves, LLC,* 341 B.R. 486 (D.N.J. 2006), *aff'd* 2007 WL 4171114 (3d Cir. 2007); *Nickels Midway Pier, LLC v. Wild Waves, LLC,* 372 B.R. 218 (D.N.J. 2007).

operating the preexisting Dungeon and Castle attraction (the "Castle"). The Lease sets rent at $250,000.00 per year and also requires Wild Waves to pay Nickels an amount equal to one-third of the real estate taxes on the entire Pier.[2]

In order to finance the construction of the water park, Wild Waves obtained a $2.8 million construction loan and a $200,000 revolving credit line from Sun Bank, both secured by a second mortgage on the entire Pier. In connection with that transaction, Nickels and Wild Waves entered into a Lease Amendment on September 29, 1999, which reads in relevant part:

> In consideration of Landlord permitting Tenant to encumber Landlord's entire premises in order to obtain financing for the construction of the water park and improvements, Tenant agrees to pay and Landlord agrees to accept the sum of $400,000.00 as additional collateral to be paid as follows: (a) $200,000.00 on or before July 30, 2000; and (b) $200,000.00 on or before July 30, 2001. The sums will be held by Nickels Midway Pier, L.L.C. for the purpose of curing any of Tenant's defaults under the loan documents to be executed with Sun Bank. The sums will be held until the aforementioned second mortgage matures in approximately five years. In the event the permitted second mortgage is paid off before its maturity date, the $400,000.00 or balance thereof will be used for rental payments as they become due.

N.A. 784-85.[3]

---

[2] The Lease sets various limits which the real estate tax payments cannot exceed, however the specific limits are not relevant here.

[3] The parties also executed an "Addendum" to the Lease on October 14, 1999. The Addendum addressed what would happen in the event that Nickels sold the Leased Premises before the second mortgage was discharged, and allowed for the parties to seek renewal of the first and second mortgages. N.A. 788.

3

On January 16, 2002,[4] the Castle was destroyed by a fire. Nickels, which carried fired insurance on the Castle in accordance with the Lease terms, collected the insurance proceeds.[5]  The Castle has not been rebuilt, but Wild Waves continues to occupy the entire leasehold property, including the Castle footprint space.

Nickels filed its voluntary Chapter 11 petition on December 8, 2003.  The parties spent the next several years litigating various issues in state court and the Bankruptcy Court, and pursuing appeals to this Court and the Third Circuit.[6]  In May, 2006, Nickels filed with the Bankruptcy Court the "Motion for Entry of an Order Directing [Wild Waves] to Make Payments of Rent and Real Estate Taxes Pursuant to the [Lease]," which is the subject of the instant appeals.  Specifically, Nickels sought to compel Wild Waves' payment of rent and real estate tax payments for the years 2004 through 2006, as well as payment of the $400,000 security deposit plus interest.  N.A. 063.

Wild Waves opposed the motion.[7]  With respect to rent, Wild

---

[4] By this time, the parties were already involved in litigation in New Jersey state court, each side asserting that the other side had committed various breaches of the parties' agreements.

[5] Two lawsuits are pending to determine whether Wild Waves has any liability for causing the fire.

[6] *See generally supra* note 1.

[7] Wild Waves also filed a cross-motion seeking (1) a stay of the proceedings; (2) abstention; (3) allowance of Wild Waves' pre-petition claims related to Nickels' alleged breaches of the Lease; and (4) authority to setoff and/or for recoupment of Wild Waves' allowed claims against any amount of rent

Waves asserted that it was entitled to a rent reduction due to the destruction of the Castle.  With respect to the security deposit, Wild Waves asserted that it should not be compelled to pay the deposit because (1) the Amendment resulted from economic duress; and (2) Nickels had constructively evicted Wild Waves by failing to replace the Castle.

At a hearing on the Motion on July 13, 2006, the Bankruptcy Court carefully considered the language of the Lease.  Finding that the "four corners of [the Lease] do not address" what adjustments, if any, should be made to the rent due under the Lease as a result of the Castle's destruction, the Bankruptcy Court concluded that a plenary hearing should be held to present evidence of "both parties' understanding and intention when the agreement was drafted."  N.A. 347.  With respect to the security deposit issues, the court held that Wild Waves was not constructively evicted as a matter of law, but it could present evidence of economic duress at the plenary hearing.

An evidentiary hearing was held on October 31, and December 7, 2006.  The Bankruptcy Court made findings of fact and conclusions of law in an oral opinion on January 4, 2007.  The court held that Wild Waves' evidence of "business and financial pressure" was insufficient to meet the applicable legal standard for economic duress.  N.A. 1139-43.

---

determined to be owed.  The Bankruptcy Court denied the cross-motion.  Neither party appeals that decision.

The Bankruptcy Court also concluded that Wild Waves was entitled to a rent abatement, finding that the parties intended that upon the destruction of the Castle, rent would be reduced pro rata based on projected revenues from the Castle.  N.A. 1150-53.

On March 6, 2007, the Bankruptcy Court entered an order directing that the $400,000 security deposit shall continue to be held in escrow[8] and that the rent for 2006 and the years following "shall be abated from the $250,000 payments recited in the Lease to $87,500."  N.A. 1174.  The court also ordered Wild Waves to "pay abated taxes in the amount of 19.2% of the total real estate taxes on the Nickels Midway Pier."  Id.  The parties timely appealed.

**II.**

The District Court has jurisdiction to hear appeals from final judgments, orders and decrees of the Bankruptcy Court in cases and proceedings referred pursuant to 28 U.S.C. § 157(a) to the Bankruptcy Court.  28 U.S.C. § 158(a).

The District Court reviews *de novo* the legal determinations of the Bankruptcy Court.  *In re Fairfield Exec. Assoc.*, 161 B.R. 595, 599 (Bankr. D.N.J. 1993).  The Bankruptcy Court's factual

---

[8] The Bankruptcy Court had previously ordered Wild Waves to pay the security deposit into escrow pending the outcome of the hearing.

determinations will be left undisturbed on appeal unless they are clearly erroneous.  Fed. R. Bankr. P. 8013.

### III.

### A.

Nickels asserts that the Bankruptcy Court committed four errors.  The Court will address each in turn.

(1)

First, Nickels asserts that the Bankruptcy Court erred when it concluded that the Lease was ambiguous as to the parties' agreement regarding rent payments after the Castle's destruction, and therefore considered extrinsic evidence of the parties' intent.  Paragraph 24 of the Lease states:

> FIRE AND OTHER CASUALTY.  The Landlord shall carry Fire Insurance and other Property and Casualty Insurance on the entire premises, including the Leased Premises, in the amount of $5,500,00.00 replacement policy.  Tenant shall notify the Landlord, at once, or [sic] any fire or other casualty at or on the Leased Premises.  Provided such fire or other casualty is not caused by Tenant, its employees, agents, or customers, the Tenant will not be required to pay rent when the Leased Premises is unusable.  If the Tenant uses part of the Lease [sic] Premises, the Tenant must pay rent, pro rata, for the usable part.  If the Leased Premises is partially damaged by fire or other casualty, the Landlord shall repair it as soon as possible.  This includes the damage to the Leased Premises and fixture installed by the Landlord.  The Landlord need not repair anything installed by the Tenant.

>     The Lease shall end if the Leased Premises is
>     totally destroyed and the Tenant has not chosen to
>     replace the Leased Premises.

N.A. 737-38.

The Bankruptcy Court concluded that paragraph 24 was ambiguous because it "did not contemplate what would happen in the event of a complete destruction of the castle and dungeon as income producing improvements." N.A. 1132. The court explained that "the premises in question are usable"-- indeed, Wild Waves operates a water park on the Pier and continues to occupy the Castle footprint space. But the Castle (i.e., the income producing improvement), was completely destroyed. In this situation, the court noted, the Lease does not answer the question of how the parties would be affected. N.A. 347. Is the Castle part of the Leased Premises or is the Leased Premises only the square footage of the Pier itself?[9] If the Castle is part of the Leased Premises, then the Lease seems to indicate that rent should be paid "pro rata," but "pro rata" according to what measure? See N.A. 1090 ("THE COURT: . . . [the Lease] does talk

---

[9] "Leased Premises" is defined as "that certain commercial Amusement Pier known as a portion of Nickels Midway Pier, Haunted Castle and Dungeon, located at 3500 Boardwalk, in the City of Wildwood, County of Cape May and State of New Jersey.  The leased premises, hereafter referred to as the 'Property' and/or 'Leased Premises,' comprises approximately 60,000 square feet and is specifically designated on the survey which is attached hereto as Exhibit A.
     The deck space on the Leased Premises shall be available to Tenant for its utilization. . . . The Leased Premises shall also include the current ticket room, one office . . . and the most southwesterly kiosk located on the Leased Premises, known as Southpark Wheel and access to the maintenance shop and facility."  N.A. 731.

about if a tenant uses part of the lease premises, the tenant must pay rent pro rata for the usable part but there's no explanation of what that means-- pro rata of what.").

Nickels contends that there is no ambiguity. It reasons that even after the Castle's destruction, the entire square footage of the leased portion of the Pier was "usable." Indeed, the parties do not dispute that Wild Waves used the entire premises by occupying the Castle footprint space and, for a time, using it for a bungee jump attraction. Nickels' argument, however, assumes, without any support in the Lease, that the "Leased Premises" consists of only the Pier deck and not the improvements-- precisely the ambiguity the Bankruptcy Court identified. Moreover, as Wild Waves observes in its brief, such an interpretation, aside from being without support in the Lease, would "result in there being no difference in the fair market rental value of unimproved deck space, as opposed to deck space which included . . . landlord-built improvements (such as the Castle and Dungeon)." Wild Waves' Br. at 12.

In any event, Nickels' argument fails because it is clear that, under New Jersey law, a court may consider evidence of the parties' intent whether or not an ambiguity exists on the face of the agreement. In *Conway v. 287 Corp. Center Assoc.*, the New Jersey Supreme Court held that extrinsic evidence of the contracting parties' intent is properly considered "when the

written terms of the agreement appear to be clear." 187 N.J. 259, 262 (2006). Stating that "we permit a broad use of extrinsic evidence to achieve the ultimate goal of discovering the intent of the parties," the Court explained,

> evidence of the circumstances is always admissible in aid of the interpretation of an integrated agreement. *This is so even when the contract on its face is free from ambiguity.* The polestar of construction is the intention of the parties to the contract as revealed by the language used, taken as an entirety; and, in the quest for the intention, the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain are necessarily to be regarded. The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance.

*Id.* at 269-70 (quoting *Atl. Ne. Airlines v. Schwimmer,* 12 N.J. 293, 301-02 (1953))(emphasis added). Accordingly, the Bankruptcy Court did not err in considering extrinsic evidence in order to determine the parties' intent with respect to rent.

(2)

Second, Nickels asserts that the Bankruptcy Court should have construed the Lease against Wild Waves, instead of construing the Lease against neither party. The court stated, "because the evidence is inconclusive as to who drafted the relevant provisions [of the Lease], this Court will not construe the terms of the lease against or in favor of either party." N.A. 1146.

10

Nickels asserts that the Bankruptcy Court committed clear error when it found the evidence to be inconclusive. According to Nickels, Wild Waves' principal, Andrew Weiner, a businessman and attorney, drafted the Lease. The record supports a finding that Weiner drafted some of the Lease. Indeed, the court stated as much in its opinion. N.A. 1145-46. But the court also heard testimony that Weiner made changes to a lease agreement provided by Nickels. N.A. 464, 967-68.

Additionally, the parties presented contradictory testimony about who produced the current draft of the Lease when it was signed. Weiner testified that when the parties met to sign the Lease, B.J. and John Nickels brought the Lease with changes they had made. N.A. 1080-81. B.J. Nickels, however, testified that he did not bring a draft of the Lease, and that Weiner produced the Lease on the night it was signed. N.A. 1041.

Specifically addressing Nickels' argument that Weiner should be considered the drafter of the Lease, the court explained,

> Mr. Weiner testified during the hearing that the evening the lease was signed, he and John Nickels poured over the draft of the document, line-by-line, before later signing that draft. His testimony was later substantiated by both John and BJ Nickels, who testified to the same during the hearing. It is simply not credible that someone who drafted an entire document would need to review each line of the document before later signing it.

N.A. 1146. The record supports the Bankruptcy Court's findings that the evidence is inconclusive as to who drafted which

11

portions of the Lease.  The court's findings are not clearly erroneous.

(3)

Next, Nickels claims that the Bankruptcy Court erred in finding that, in the event of the Castle's destruction, the parties intended for rent to be abated according to lost Castle revenues.  The court stated,

> [T]he evidence is conflicting with regard to the understanding of the parties in entering into the lease, as to whether the castle and dungeon would provide for the rental obligations of the leasehold.  However, this Court finds that the evidence is strong that the parties contemplated that the castle and dungeon would provide, at least in part, Wild Waves' rental obligations . . . to the Nickels for the leasehold.
> Therefore, because the complete destruction of the castle and dungeon was not specifically addressed by the lease in paragraph 24 and because the evidence is strong that the parties' understanding, including a belief that the castle and dungeon would provide income sufficient to at least offset the rental obligations arising under the lease, that some abatement of the rental obligation is justified due to the loss of the castle and dungeon as income-producing improvements on the leasehold, under the terms of the business lease.

N.A. 1149-50.

Nickels asserts that, contrary to the court's opinion, the evidence shows that the parties intended that any abatement would be based on use of the Pier in square feet, not lost revenues.

The only evidence Nickels points to, however, is the language of the Lease itself, which, as explained *supra*, is not at all clear.

Moreover, Nickels ignores the evidence presented at the hearing that during the parties' negotiations, rent was set at $250,000 a year because net income from the Castle was $250,000 a year. Weiner testified:

> A:  Basically [Steve Nickels and B.J. Nickels] told me that the castle generated approximately $250,000 a year net income and therefore that income would be used to pay the rent for the deck. And essentially the rest of the deck because we were doing the improvements– would basically come for free. . . .
>
> Q: Okay.  It was the Nickels who made the nexus between the cash flow from the castle and dungeon and the fact that we'd [sic] cover the annual payment?
>
> A: Oh, absolutely.

N.A. 457. Weiner went on to testify that Nickels gave him documentation regarding the Castle's profits and that he relied on the information given to him. N.A. 457-59. The Bankruptcy Court specifically found this testimony credible, while finding not credible Steven Nickels' testimony to the contrary. N.A. 1146, 1153. Relying on inconsistencies between Steven Nickels' testimony and the documentary evidence, the court chose not to believe Nickels' testimony. N.A. 1146-47. Specifically, Wild Waves introduced into evidence a letter from Nickels to Wild Waves, dated January 8, 2001, that states, "'It has always been our firm belief that the castle complex receipts would in most

13

part take care of the rental obligations of your lease.'" N.A. 1033.

The Bankruptcy Court's findings with respect to the parties' intent in drafting the Lease are supported by the evidence and are not clearly erroneous.

(4)

Finally, Nickels claims the Bankruptcy Court erred by "altering and modifying" other Lease terms without finding those terms ambiguous. As explained previously, however, the court need not have found an ambiguity before considering evidence of the parties' intent and then interpreting the Lease in accordance with that intent. *See Conway,* 187 N.J. at 269-70.

Moreover, the Bankruptcy Court's interpretation of those terms is supported by the evidence. In addition to concluding that rent should be abated, the court also concluded that Wild Waves should pay 19.2% of the real estate taxes on the Pier, (rather than one-third of the real estate taxes) and that Wild Waves would not be required to pay any post-petition increase in real estate taxes. Nickels asserts that the Bankruptcy Court made these changes without any factual basis, but the record demonstrates otherwise.

Weiner testified that during Lease negotiations, "B.J. [Nickels] indicated to me that because the castle and dungeon

were the major improvement on the property that we should bear some of the responsibility for the taxes because obviously that was generating taxes on the property." N.A. 451. Additionally, Weiner testified that the construction of the water park on the Pier would not increase the real estate taxes, because such improvements are not considered in assessing real estate taxes. N.A. 452. Accordingly, the record supports the conclusion that the parties intended the real estate payments to be determined in a manner similar to rent. The court did not clearly err by interpreting the Lease to require reduced property tax payments upon the Castle's destruction.[10]

**B.**

In its cross-appeal, Wild Waves asserts that the Bankruptcy Court erred by requiring Wild Waves to pay the $400,000 security deposit.[11] In support of its position, Wild Waves asserts two arguments.

---

[10] Nickels also briefly asserts that the Bankruptcy Court clearly erred by: (1) directing that the $400,000 escrow be held in trust by Wild Waves' counsel rather than held by Nickels; and (2) altering the time periods for making payments under the Lease. Nickels fails to explain how these changes are material to the parties' agreement (as interpreted by the court), and in any event, the changes are logically consistent with the court's findings as to the parties' agreement.

[11] As an alternative ground for justifying its entitlement to rent abatement, Wild Waves also asserts that the Bankruptcy Court erred by holding that Wild Waves was not constructively evicted. Because this Court will affirm the Bankruptcy Court's holding that the Lease entitles Wild Waves to rent abatement, there is no need to address the constructive eviction issue.

(1)

First, Wild Waves claims that the security deposit is no longer required under the terms of the Lease. The Amendment to the Lease states that the $400,000 "will be held until the aforementioned second mortgage matures in approximately five years." N.A. 785. According to Wild Waves, this language means that the escrow arrangements expired after five years, i.e., "sometime in September or October 2004." Wild Waves' Br. at 21. Wild Waves' argument, however, fails to account for the fact that the mortgage's maturity date has been extended three times and is currently set to mature in August, 2008. This Court agrees with the Bankruptcy Court's reasoning in rejecting Wild Waves' argument:

> Although the language in the amendment refers to sums being held until the second mortgage matures, the fact is that Wild Waves extended the maturity and this Court permitted the extensions to be recorded, which extended the requirement that escrow be held. The fact that the time period was set forth as approximately five years evidences the parties' understanding that the maturity date could fluctuate and/or be extended.

N.A. 349-50.

Contrary to Wild Waves' assertions, nothing in the Amendment's language suggests that the escrow was to expire when the mortgage *first* matured. This Court finds no error in the Bankruptcy Court's decision.

16

(2)

Likewise, this Court finds no error in the Bankruptcy Court's rejection of Wild Waves' claim that the security deposit agreement is void because it was obtained under economic duress. According to Wild Waves, Nickels agreed to encumber the entire Pier from the time the Lease was originally signed and then threatened to renege after it knew that Wild Waves had entered into various contracts to construct the water park. Essentially, Wild Waves claims that Nickels forced it to amend the Lease and pay the $400,000 security deposit or face the prospect of multi-million dollar breach of contract litigation with various contractors, suppliers and equipment manufacturers.

Nickels asserts that it believed that Wild Waves only wanted to encumber the leased portion of the Pier. Accordingly, Nickels claims that when it learned that Wild Waves wanted to encumber the entire Pier, it required the security deposit in exchange for the additional encumbrance.

The Bankruptcy Court correctly found that the evidence did not support Wild Waves' version of events. The undisputed evidence presented at the hearing established that Weiner is an attorney and seasoned businessman, whereas the Nickels were not represented by counsel when the Lease or the Amendment were signed. The parties also do not dispute that it was Wild Waves, not Nickels, that pushed to get the Lease signed.

More importantly, while Weiner testified that Wild Waves was irrevocably bound to agreements with various vendors, the documentary evidence proved otherwise. The Lease Amendment was dated September 29, 1999, but Wild Waves' contract with White Water West Industries was not signed until October, 1999. Similarly, Wild Waves signed a Letter of Intent with SCS Interactive, Inc., on October 19, 1999, and did not sign the actual contract with SCS until January 11, 2000.

The Bankruptcy Court also found that the evidence supported Nickels' assertion that it did not believe that the second mortgage was to encumber the entire Pier when the Lease was signed. Indeed, Weiner testified that when he sent John Nickels the Sun Bank commitment letter months after the Lease had been signed, Nickels refused to sign it because he did not want to encumber the non-leased portion of the Pier.

In short, the evidence presented is inconsistent with Wild Waves' claim that Nickels acted in a calculating manner to trap Wild Waves into assenting to the Amendment. Under New Jersey law, economic duress requires a showing of "wrongful" acts or threats. *Cont'l Bank of Pa. v. Barclay Riding Acad., Inc.*, 93 N.J. 153, 177 (1983). The acts or threats need not be illegal, but must be "oppressive" or wrongful "in a moral or equitable sense." *Id.* Because the Bankruptcy Court found no evidence to support Wild Waves' version of events, it correctly held that

Wild Waves failed to prove economic duress.

**IV**.

For the reasons set forth above, the Bankruptcy Court's Order of March 6, 2007, will be affirmed.  The Court will enter an appropriate order.

Dated: March 17, 2008

                                                    s/ Joseph E. Irenas
                                                    JOSEPH E. IRENAS, S.U.S.D.J.